Belknap,
April 7, 1942. } No. 3316.

ALEXANDER CHARLES *v.* JOHN McPHEE *& a.*

112

*Robert W. Upton* and *Richard F. Upton* (*Mr. Richard F. Upton* orally), for the plaintiff.

*Murchie & Murchie* (*Mr. Alexander Murchie* orally), for the defendant McPhee.

*Paul E. Nourie* (by brief and orally), for the defendant Barton.

PAGE, J.  I.  Since the plaintiff was reading a letter just previous to the accident, he was oblivious to all his surroundings and was unable to correct any distortion of fact that may have arisen because the only eye-witnesses were the two defendants, each of whom seems to have been anxious to lay the full blame on the other.  In this situation, the jury could find evidence to justify almost any result.

McPhee now admits that his motions for a nonsuit and for a directed verdict were properly denied.  It could be found that he overtook the Barton car and attempted to pass it.  At the moment, Barton, having arrived at a point opposite to his yard, was preparing to turn left onto his premises.  When McPhee's front wheels were opposite Barton's rear wheels, McPhee noticed that Barton was turning without having given previous signal of his intention.  Barton continued to turn, blocking the left-hand lane.  To avoid

Barton's car, McPhee took a sharp swing to the left. At a lower speed, McPhee could have guided his car to a place of safety. His speed being excessive and negligent, he was unable to do so, and crashed into a pole. When the situation finally developed, his choice lay between a collision with the Barton car and a vain attempt to avoid the pole, the only other obstacle. On such a finding, permissible though not compulsory, Barton's failure to note McPhee's signal for passing and to observe his lack of control, and his turning without notice to McPhee, could be found to have concurred with McPhee's lack of control in causing the injuries of the plaintiff.

II. Since the defendant Barton was found liable for causal negligence, the defendant McPhee takes nothing by his exception to the denial of his request for an instruction that if Barton violated the law of the road, a verdict should be returned against him. Since McPhee admits that he himself could be found causally negligent, he takes nothing by his further exception to the denial of a request for an instruction that if Barton's violation of the law of the road was the sole cause of the accident, there should be a verdict for McPhee.

III. The plaintiff's exceptions were to rulings which he conceives may have affected the amount of the damages awarded. They fall into three categories.

(1) His counsel asked one of his medical experts for an opinion as to the cause of the loss of sensation in the plaintiff's right arm and right side. It was objected that the question should incorporate the assumed fact that the loss of sensation did not appear until two years after the accident. Both counsel and the court seem to have overlooked the fact that the plaintiff had testified that the loss of sensation appeared immediately after the accident, or at most very shortly thereafter. The court suggested that whatever the fact was it be established before the question was put. Counsel demanded an exception to his not being allowed to put his question without that limitation. The question was admissible as it stood. The error, however, could not have harmed the plaintiff.

Shortly thereafter, counsel put substantially the same question to the same witness, but including the words "later he [the plaintiff] complained of numbness in his right arm, and that when examined, to determine the degree of sensation in his right arm and right side, on December 1st and December 2nd, there was found to be a loss of sensation in both arm and side." The question was answered without objection. The loss of sensation, the witness said, was due to an

injury to the central nervous system of the brain. The plaintiff argues that the answer was ambiguous. There is no warrant for the supposition that the answer to the excluded question would have been any different. As to the time when the loss of sensation appeared, the original question was no more definite than the second. While the witness said in his answer that the brain injury might have been due to bleeding or hysteria, he had already testified clearly that whatever the immediate channel of injury, it was set in motion by the accident.

(2) McPhee's counsel, in cross-examining one of the plaintiff's medical witnesses, put to him the following questions, which were admitted subject to the plaintiff's exceptions:

(a) "And did you tell us then [at the first trial] that you knew of no reason to think that the plaintiff here would not get well?" The answer was that the witness did not remember making any such statement, and would say he did not.

(b) Asked whether he had not testified that ligaments with the proper treatment get back to normal, the doctor said that he did not remember that statement.

(c) Asked whether he had not said that there was no reason to think that they would not get back to normal in this case, the witness said, "I can't remember answering those questions."

The objections to these questions were based upon *Carbone* v. *Railroad*, 89 N. H. 12, 17, where a witness was asked whether, to his knowledge, a witness had been ordered out of the jurisdiction, and answered "no." The testimonial declaration of counsel in asking that question was held to be error in the absence of a finding that it did not render the trial unfair. Counsel, by mere innuendo, got into the jury's minds a supposed fact of which the witness had no knowledge whatsoever, and which as far as appeared there was no reason to suppose was in his cognizance. In the case before us the witness was asked about his oral testimony in the same action only six months before, concerning which he obviously might be expected to have knowledge and memory. "The question was not so clearly incompetent that no reputable lawyer could believe that it was competent." *Holman* v. *Railroad*, 76 N. H. 496, 497. Moreover, the stenographic record of the former testimony presumably was equally within the knowledge and control of both parties. The situation is quite different from the prejudicial fishing done in the *Carbone* case.

If the plaintiff's counsel, in suggesting that the questions were

"without any proper basis," had in mind the practice outlined in *Villineuve* v. *Railway*, 73 N. H. 250, 252, it may be remarked that the record of oral testimony at the former trial is not a document or writing of the witness, which must be proved before it can become the basis of cross-examination. The practice referred to, which has been criticized, does not apply in such a case as this. *State* v. *Mannion*, 82 N. H. 518, 522, 523.

This was the ordinary case of cross-examination to test the credibility of the witness. The cross-examiner failed to contradict the witness. He was content with that. If the cross-examiner, in such circumstances, has tricked the jury by a misquotation, the fact can readily be made to appear by the contrary party, the trick exposed, and the tables turned effectively against the cross-examiner. The difficulty in the *Carbone* case was that the later production by the defendant of the absent witness could not remove from the jury's mind the prejudice of the thought that the defendant had intended, until caught, to deprive the jury of the privilege of hearing an eye-witness. We now have a case where, if there was any possible thought of prejudice, it could have been removed with the greatest of ease. There is no presumption, much less any evidence, that the cross-examiner here was chargeable with unfairness.

(3) Counsel for McPhee argued to the jury that the plaintiff's nervousness was due to his marital difficulties. "Well, now, gentlemen, it has been put in evidence that Mr. Charles was made very nervous on account of his marital difficulties. Nobody is condemning him for that, and the only reason that [it] is brought into the case, gentlemen, is that Mr. McPhee ought not to pay money out of his pocket for any nervousness caused Mr. Charles by his difficulty with his wife. Now that these difficulties were protracted with nervousness and worry, there can't be any doubt. They went clear back to 1932, — the first time was way back in June, 1932, when Mr. Charles, over his own signature, claimed that said Jianoula Charles, 'wholly regardless of her marriage covenant and duty has on divers days and times between June, 1931, and the date of the filing of this libel so treated the said libelant' — that means Mr. Charles — 'by reason of her disagreeable conduct, nagging, fault-finding, ugliness, neglect of her home and other misconduct as to seriously injure his health.'"

The objection to this statement was, primarily, that there was no evidence to warrant it; secondarily, that the sub-quotation was not matter in evidence. Upon the secondary objection, McPhee's coun-

sel asked the jury to take their own recollection of the evidence, and the court twice instructed them to do so, and to consider nothing except what was in evidence.

The evidence on the issue was clear. The plaintiff was asked whether in his libel for divorce he had alleged that his wife's conduct made him nervous. His counsel having objected that the record would be the best evidence, the original libel was produced, the plaintiff identified the signature as his, and the paper was marked as Exhibit A for identification. There was then produced, similarly identified, and marked Exhibit B for identification, the answer of the plaintiff, dated September 10, 1937, to his wife's libel for divorce.

As to the proceedings of 1932, the plaintiff testified, "Well, when those things happen, it makes you feel nervous." As to those of 1937, he testified to the same effect. Then he was asked, "Since 1932 you have been nervous on account of the troubles with your wife?" The answer was "Yes." Those troubles had not ended on the day of the accident. The substance of the argument was therefore supported by the plaintiff's own testimonial admission, as was the date assigned.

It was understood that either party might read in evidence what he desired from the exhibits marked for identification. McPhee's counsel read in evidence the only extract introduced, as follows: "11. But that the libelant, wholly regardless of her marriage covenant and duty, while they were resident in Meredith, did constantly nag and upbraid the libelee, was jealous of his entertainment of his customers, was constantly seeking to and did get considerable money from him, but her actions has [sic] interfered with his business, and did in other ways so treat the libelee as seriously to injure his health and endanger his reason."

A comparison of this passage with that read in the argument shows verbal differences. Internal evidence demonstrates that a portion of Exhibit B was put in evidence, and that counsel read inadvertently in argument from Exhibit A. The difference in the allegations of the wife's conduct is immaterial, since the purpose of the evidence and the argument was to establish the effect of the wife's conduct on the nerves of the plaintiff. That effect, as given to the jury in evidence, was that his health was seriously injured and his reason endangered. As read in argument, the effect was serious injury to health, with nothing said about danger to his reason. The material part was thus understated in the argument. It is not to be thought that the inadvertent reading from the wrong document

(*Bullard* v. *McCarthy*, 89 N. H. 158, 161) could have misled the jury or prejudiced the plaintiff. This is particularly so in view of the stronger language of the plaintiff actually in evidence and his admissions on the stand. Nor can prejudice be assumed in view of the request of counsel that the jury take their own memory of the precise evidence, not his, and the twice-told instruction by the court that they should do so. *Moran* v. *Dumas*, 91 N. H. 336; *Manning* v. *Company*, 90 N. H. 167.

*Judgments on the verdicts.*

BRANCH, J., did not sit: ALLEN, C. J., doubts Barton's liability, but otherwise concurred; the others concurred.